TOBIAS, J.,
concurs in the result and assigns reasons.
LI respectfully concur in the result.
The operative provisions of the employment agreement existing between Ms. Mi-pro and Lycée Frangais de la Nouvelle-Orleans (“LFNO”) are as follows:[1]
EMPLOYMENT AGREEMENT
LYCEE: Lycée Frangais de la Nou-velle-Orleans, a nonprofit public corporation, located at 5401 S. Claiborne Avenue New Orleans, LA 70125
EMPLOYEE: Darleen MIPRO
POSITION: Special Education Coordinator, English Head
COMMENCEMENT: August 13th, 2012
DURATION: 1 year.
SERVICE OBLIGATIONS: 40 hours per week
SALARY: $51,500
The Employee, if not a U.S. citizen, must comply with all U.S. immigration laws.
Executed in New Orleans, Louisiana on May 27, 2012
EMPLOYEE SIGNATURE
*658 [[Image here]]
[[Image here]]
6. Dismissal/Resignation An LFNO employee may resign his/her position with 60 days written notice. Similarly, your contract may be terminated, upon 60 days written notice, unless the termination is for cause, in which case it can be terminated at any time without notice.
According to the evidence, students were in school from approximately mid-August through the first four or five days of June of each academic year. LFNO’s teachers were expected to attend in-service meetings for faculty during the first week or two of August prior to the commencement of classes, and again for roughly three days in June once classes for the students were concluded. While teachers were welcomed and encouraged to present to the school and work over the summer months to prepare lesson plans, work on certifications, et cetera, contrary to the “40 hours per week” for the duration of “1 year” as expressly stated in the employment agreement, LFNO did not expect, nor were the teachers required, to come to work for 40 hours per week from about the 7th of June through the 1st week of August. So while LFNO considered its faculty to be year-long employees, the testimony elicited at the hearing evidenced that the teachers only actually worked at school for approximately ten months of the year.
LFNO paid its teachers their respective annual salaiies for the ten-month school year divided over a twelve-month pay period, or bi-weekly consisting of 26 pay periods. In short, the teachers’ annual salary, which paid them for ten months of actual teaching, was paid out over a twelve-month period rather than being paid Rout in full over the ten months in which they actually taught (or in about 20 pay periods).
According to Ms. Mipro, she only seeks the total amount of her annual salary that she would have received for the four months that she worked had LFNO divided and paid her annual salary over a ten-month period rather than the amount LFNO actually paid her based upon a division of her annual salary over a twelvemonth period. Put another way, had Ms. Mipro been given the option and had elected to receive her annual salary of $51,500 over the ten months that she was expected to teach (which included the one to two weeks in August before the students commenced classes and the three days in June after classes ended), she would have received bi-weekly payments of $2,575 for 20 weeks. Instead, LFNO, for policy reasons, paid their teachers their annual salaries divided over a twelve-month period for the same amount of time worked. According to Ms. Mipro, this was done as a mere courtesy or convenience to its faculty and staff in order to provide them with income throughout the year. Under the twelvemonth pay scheme, Ms. Mipro was paid a bi-weekly salary of $1,980.77, yielding a difference of approximately $594 per pay period. At the time of her termination, Ms. Mipro had worked the months of August, September, October and November, or for a total of eight pay periods; she *659 received only $1,980.77 of the total $2,575 she claims she was owed, but for LFNO’s courtesy of stretching her pay out to cover the summer months. Thus, Ms. Mipro contends, and the trial court agreed, that LFNO remains indebted to her for the $594.28 shortfall for each of the eight pay periods that she worked, or for a total of $4,758.84.
I find the terms of the employment agreement are ambiguous. The evidence in the record supports Ms. Mipro’s contentions. The trial court judge did not abuse her discretion. The trial court was not manifestly erroneous in its conclusions.

. While an issue as to the validity of Ms. Mipro’s written employment agreement was raised during the trial, its legality is not raised as an issue on appeal. Nonetheless, for purposes of this concurrence, the operative provisions that I address are not in dispute; i.e., duration, service obligations, and quantum of salary.